

# NUMBER 13-12-00767-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF A. M. AND C. M., CHILDREN

### On appeal from the County Court at Law No. 5
### of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Benavides and Longoria
### Memorandum Opinion by Chief Justice Valdez

T.M., the mother, and H.M., the father, appeal the termination of their parental rights to their children, A.M. and C.M.[1]  *See* TEX. R. APP. P. 9.8(b)(2) (providing that in a parental-rights termination case, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member").  By three issues each, T.M. and H.M. contend that the evidence is

---

[1] At the time of the termination trial, A.M. was three and C.M. was one and a half.

legally and factually insufficient to support a finding that they violated section 161.001(1).[2]   By her fourth issue, T.M. contends that the evidence is legally and factually insufficient to support a finding that termination of her parental rights is in the children's best interest.  We affirm.

## I.  BACKGROUND

On July 21, 2011, C.M. was taken to Driscoll Children's Hospital after being thrown from his car seat and sustaining injuries.  Vicky Corona, an employee of the Texas Department of Family and Protective Services (the "Department"), investigated the cause of C.M.'s injury.  Corona received a report "alleging the physical abuse and neglectful supervision" of the children by T.M. and H.M.  It was reported to Corona that H.M. threw C.M. in his car seat from a vehicle because H.M. did not want to take C.M. with him to run errands.  According to the report Corona received, there was "a history of domestic violence and drug use in the home."  On July 22, 2011, the trial court signed an order for protection of a child in an emergency ordering that the Department serve as the children's temporary sole managing conservator.  T.M. and H.M. were ordered by the trial court to complete the family services plan as set out by the Department.

On February 15, 2012, a jury found H.M. guilty of injury to a child for throwing C.M. out of the vehicle and injuring C.M.  H.M. received a five year sentence for the offense.[3]   On October 30, 2012, a jury trial was held to determine whether T.M.'s and H.M.'s parental rights would be terminated.   After hearing the evidence, the jury answered "yes" as to both children to the following questions:

---

[2] T.M. and H.M. have filed separate briefs in this appeal.

[3] H.M. has appealed his conviction; that appeal is pending in this Court.

2

[1.] Do you find by clear and convincing evidence that [T.M.] has knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional wellbeing of the children?

[2.] Do you find by clear and convincing evidence that [T.M.] has engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional wellbeing of the children?

[3.] Do you find by clear and convincing evidence that [T.M.] has failed to comply with the provisions of the court order that specifically established the actions necessary for her to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children?

[4.] Do you find by clear and convincing evidence that the termination of the parent/child relationship between [T.M.] and the children, [A.M.] and [C.M.], is in the best interest of the children?

[5.] [D]o you find by clear and convincing evidence that [H.M.] has knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional wellbeing of the children?

[6.] Do you find by clear and convincing evidence that [H.M.] has engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional wellbeing of the children?

[7.] Do you find by clear and convincing evidence that [H.M.] has been convicted or placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under Texas Penal Code [section] 22.04 or adjudicated under Title 3 for conduct that caused the death or serious injury of the child and that would constitute a violation of Texas Penal Code [section] 22.04?

[8.] Do you find by clear and convincing evidence that [H.M.] knowingly engaged in criminal conduct that has resulted in the parent's conviction of an offense and confinement or imprisonment and inability to care for the children for not less than two years from the date the petition was filed in this case, July 22, 2001?

[9.]    Do you find by clear and convincing evidence that termination of the parent/child relationship between [H.M.] and the children, [A.M.] and [C.M.], is in the best interest of the children?

On October 31, 2012, the trial court ordered both T.M.'s and H.M.'s parental rights to A.M. and C.M. terminated. This appeal followed.

## II.    STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. Before terminating the parent-child relationship, the trial court must find by clear and convincing evidence that the parent committed one of the acts prohibited by section 161.001(1)(A–T) of the Texas Family Code. TEX. FAM. CODE ANN. § 161.001(1)(A–T) (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The trial court must also find by clear and convincing evidence that termination of parental rights is in the children's best interest. TEX. FAM. CODE ANN. § 153.002 (West 2008).

The "clear and convincing" intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006 pet. denied); *Porter v. Tex. Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi 2003,

4

no pet.). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Although there is no requirement that the evidence be unequivocal or undisputed, the proof must "weigh heavier than merely the greater weight of the credible evidence." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d at 266); *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.). We must assume that the trier of fact resolved disputed facts in favor of its finding if it was reasonable to do so. *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d at 266). We must also disregard all evidence that a reasonable fact-finder could have disbelieved or found to be incredible. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. "If [an appellate court] determines that no reasonable fact-finder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161,

5

168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). Under this standard, we consider whether the

> disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*In re J.F.C.*, 96 S.W.3d at 266.

### III. STATUTORY GROUNDS FOR TERMINATION

In this case, the trial court found by clear and convincing evidence that T.M. violated section 161.001 by (1) "knowingly place[ing] or knowingly allow[ing] the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children," *see* TEX. FAM. CODE ANN. § 161.001(1)(D), (2) engaging "in conduct or knowingly plac[ing] the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children", *see id.* § 161.001(1)(E), and (3) failing to "comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the children's removal from the parents under Chapter 262 for the abuse or neglect of the children," *see id.* § 161.001(1)(O). The trial court found by clear and convincing evidence that H.M (1) "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children," *see id.* § 161.001(D); (2) "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children," *see id.* § 161.001(1)(E);

6

(3) had "been convicted . . . for being criminally responsible for the death or serious injury of a child . . . for conduct that caused the serious injury of a child" and constituted a violation of section 22.04 (injury to a child) of the Texas Penal Code, *see id.* § 161.001(1)(L); and (4) "knowingly engaged in criminal conduct that has resulted in the father's conviction for an offense and confinement or imprisonment and inability to care for the children for not less than two years from the date" the Department filed the petition, *see id.* § 161.001(1)(Q).

## A.    The Evidence

H.M. was convicted of injury to a child after he was accused of throwing C.M. out of a vehicle and injuring C.M. H.M. was sentenced to five years' incarceration for that offense. H.M. was in prison at the time of the parental termination hearing.

Regarding the events leading to C.M's injury, H.M. testified that on the prior day, he had argued with T.M. after doing a line of cocaine. H.M. claimed "It was just only like maybe like $15 worth [of cocaine]." According to H.M., T.M. became angry that he had ingested cocaine, and they began to argue. H.M. denied that he ever physically assaulted T.M. and claimed that T.M. bit him during the argument and would not allow him to leave.[4] H.M. stated that the next day, the day C.M. was injured, H.M. attempted to run some errands with A.M. H.M. testified that T.M. wanted him to take C.M. with him to run the errands; however, H.M. did not want to take C.M. with him. According to H.M., he left in his vehicle without C.M., and then T.M. started running after him and dropped C.M. H.M. denied throwing C.M. out of the vehicle and claimed that C.M. was

---

[4] It is unclear from H.M.'s testimony exactly when T.M. allegedly bit him; however, H.M. acknowledged that the children were present when it happened.

7

never in the vehicle. H.M. acknowledged that T.M. and an unnamed person who called 911 regarding the incident reported that H.M. threw C.M. out of the vehicle.

H.M. stated that when he returned home, he discovered that the children had been removed. H.M. claimed that T.M. told him she had "lied" and "messed up." H.M. testified that T.M. recanted her story that he had thrown C.M. out of the vehicle and had admitted that she had injured C.M.

When asked if the domestic violence in the home "went back years," H.M. replied, "Yes." H.M. denied that the children had been present when domestic violence occurred, then clarified that the children were present on the day that C.M. was injured and domestic violence had occurred.

On cross-examination by the children's attorney ad litem, H.M. stated that T.M. was aware of his criminal history and gang affiliation when they began their relationship. According to H.M., at his injury to a child trial, T.M. "told the truth." H.M. stated:

> She [T.M.] said that I was leaving in the car. And for some reason, I don't know what made her get in her mind, she started chasing me. She had [C.M.] by the car seat. When she chased me, like maybe about—maybe like about 15 feet, [C.M.] had flew—he fell off the car seat. When you're running, you know, and you vibrate, especially when you're holding something—

H.M. recalled that T.M. had alleged that he had violated the protective order by hitting her, but he denied it. H.M. stated he did not know how T.M. was injured. H.M. then testified that he believed that T.M. received an injury to her nose or mouth because he was attempting to leave and she was "holding [him] back."

According to H.M., in the four months after the children were removed from his home and before being indicted for injury to a child, he attended visitation with his children for two hours once per week, went to visit his children with T.M., worked full-

8

time as a line supervisor at a local restaurant, and had a home where the children could live.  H.M. and T.M. lived together during this four month period.  H.M. testified that when he is released from prison, he plans to go back to work at his former job.  According to H.M., he is eligible for parole in October 2013, and he has a place to live.

On re-direct examination the Department's attorney asked H.M. if believes T.M. is a good mother, he responded, "Yes.  I mean, besides all of this, yes, she is a good mother."  H.M. acknowledged that his and T.M.'s actions on the day C.M. was injured were not "good" for the children.  When asked, "So would you agree that that put you— both of your children in danger," H.M. replied, "Yes, we did—we did put our children in danger."

When asked if he paid child support for his three other children, H.M. explained that he did not because

> [f]irst, my first wife, my first girlfriend, she had me on child support.  I was paying child support, but then she got her kids taken away.  She was in a different relationship and she was involved with a whole bunch of people who did drugs and all that.  And my daughter, I lost rights because she wasn't doing her job as a mom.  This happened like a long time ago.  So my daughters are with her aunt right now.

H.M.'s daughter was thirteen at the time of this trial, and his parental rights to her were terminated in 2004.  When asked about his other two children, H.M. said, "[Their mother] she didn't want no—she didn't want to let me near my kids.  We didn't even actually have a relationship.  She took them all the way to Oregon."

On re-cross examination by the children's attorney ad litem, H.M. stated that T.M. had a cell phone during their relationship, was able to use her cell phone at any time, was "free to do whatever she wanted," had family members in Corpus Christi, Texas, where they resided, and could "somewhat" turn to those relatives for help.  H.M. testified

9

that T.M. injured him by biting his back, would "block" the doorway when he wanted to leave, was capable of being aggressive, and would attempt "to get under [his] skin" to elicit a negative reaction. H.M. clarified that T.M. bit him approximately four times during their four-year relationship. H.M. testified that T.M used marihuana on approximately seven or eight occasions. H.M. stated that he and T.M. would sit on the porch and smoke a "joint" when A.M. and C.M. were asleep.

H.M. stated:

> Well, all I want to say to the jury is that before I was indicted in this crime and convicted of this crime that I'm here in prison for, before me and [T.M.] were out there, we were two people raising—raising two kids. I did my job as working at providing for the family. [T.M.] did her job at being a housewife and taking care of the kids and taking care of the house. Yes, we did have problems. You know, we argued about little things sometimes, but I never thought it was going to get to this.

T.M. testified that at the time of the trial she was twenty-two years old and lived with her aunt, D.G. T.M. acknowledged that she understood that she was required to provide the Department with information concerning with whom she resided. T.M. admitted that she had not provided the Department with any information regarding D.G. because "it's not [her] area to give out [D.G.'s] information." T.M. stated that she had provided D.G.'s name to the Department. T.M. testified that prior to living with D.G., she had resided in an apartment in Oklahoma. T.M. stated that the apartment had been "denied" by the Department and that she did not know why. Prior to living at the apartment, T.M. resided with her parents in Oklahoma and prior to that she lived with an uncle, R.G., in Chicago.

According to T.M., R.G. traveled to Texas to testify at a hearing regarding T.M.'s children. R.G. agreed to have the children placed with him. T.M. stayed at her uncle's

10

home from May 11 until June 13.[5] During that time, the Department ordered a home study of R.G.'s home in an effort to place the children with R.G. When asked why that placement was not successful, T.M. explained that her uncle had yelled at her "for being on Facebook" and talking to H.M.'s ex-girlfriend. T.M. believed that R.G. treated her like a child and did not appreciate that. T.M. stated that the arguments with R.G. became physical and claimed that he hit her. T.M. denied hitting R.G.

T.M. had been removed from her biological parents when she was three and adopted when she was eleven. R.G. is T.M's biological uncle. T.M. claimed that she had been removed from her parents because R.G. had sexually assaulted her. T.M. testified that she did not actually remember who sexually assaulted her and that her sister had told her that R.G. had committed the offense. T.M. admitted that she had not informed the trial court of this allegation when she initially asked for the Department to place the children with R.G. T.M. stated that she failed to inform the trial court of the alleged sexual assault

> [b]ecause he was going to take my kids and then he was—because he knows that once they get with family, the mother's rights don't get terminated. So he was going to give me my kids back because I told him I don't want him to be left alone with my kids. I don't want him to be nowhere near my kids by himself.

However, T.M. denied that she was willing to place the children in a dangerous environment by allowing them to live with an uncle who allegedly sexually abused her. T.M. explained that she was not the type of person to allow her children to remain in that type of environment. T.M. then acknowledged that the Department conducted a study of R.G.'s home and that she wanted her children placed in R.G.'s home. T.M.

---

[5] T.M. did not clarify the year; however, it appears from the record that T.M. lived with her uncle in 2012.

stated that she understood that if the home study was positive, R.G. would acquire custody of the children and that the children would live with him. Eventually, R.G. told T.M. that he no longer wanted her children placed in his custody.

Prior to living with her uncle, T.M. resided with H.M's ex-girlfriend, F.B. T.M. acknowledged that she had requested the Department to conduct a home study of F.B.'s apartment with the intention of living there with her children. T.M. stated that after she moved out of F.B.'s apartment, she discovered that F.B. is affiliated with several gangs. T.M. denied that she had knowledge of F.B.'s gang affiliation while she resided with F.B. T.M. agreed that at a prior hearing regarding her children, she testified that F.B. was "bad news" and not a "good person" and that she did not want F.B. to know her whereabouts. T.M. denied that she has had contact with F.B. after discovering that F.B. is affiliated with gangs. T.M., however, also acknowledged that F.B. had been at one of T.M.'s visitations with her children. T.M. testified that it was not her fault that F.B. attended the visitation because F.B. "just showed up . . . on her own." T.M. agreed that she filed a police report in August alleging that F.B. had assaulted her.

Before T.M. lived with F.B., she lived at Hope House, which is a place where the staff "helps you get on your feet and go into government apartments." T.M. stated that she was "kicked out" of Hope House, but it was not her fault. According to T.M., she was unaware that there was a curfew and was a few minutes late one night. She was then evicted from Hope House. T.M. also claimed that she was evicted because she failed to provide the appropriate paperwork.[6]

---

[6] We note that T.M.'s testimony is at times difficult to understand.

12

Prior to living at the Hope House, T.M. resided at the apartment she shared with H.M., who had been arrested for injuring C.M. in December 2011. T.M. testified that she was aware that H.M. was in a prison gang, but that he told her he no longer belonged to that gang. T.M. also stated that she was unaware if H.M. was currently a gang member. T.M. stated, "I don't know, I didn't even know if he dropped out of the fricking gang or if he's an ex-gang member or whatever he is. . . . That's how I found out that he's still part of that gang. He told me when he got out, that yeah, he's not a gang member, but he still socializes with them little by little." T.M. described an event where H.M. met a friend at the bus station and failed to introduce her to the friend. According to T.M., H.M. told her that he did not want this particular friend to know that he had a wife and kids. T.M. said, "And then I kind of like put two to two together and it was, oh, then this dude is still socializing with the gang that he said that he was out of."

T.M. testified that she had been with H.M. for approximately four and half years and that she was not his common-law wife. T.M. acknowledged that H.M. supported her and the children but stated it was not her fault that H.M. controlled her life and would not allow her to work. T.M. agreed that she talked to H.M. after he was convicted of injury to a child.

T.M. claimed that there had not been any domestic violence in her relationship with H.M. and that they mainly argued verbally. T.M. said that when she met H.M., she was seventeen years old. T.M. explained that at that time, her father found out that H.M. was thirty-two years old, and her father threatened to kick her out of the house; therefore, T.M. lied to her father claiming that H.M. had assaulted her in order to keep H.M. away. T.M. reasoned that if she claimed H.M. assaulted her and got a protective

order, H.M. would stop going to her house, and she would no longer get in trouble. The protective order was issued in 2008 for three years. T.M. stated that the protective order had recently expired.

T.M. acknowledged that in 2008, she reported to police that H.M. had punched her in the face with a closed fist and had choked her. When asked, "And you don't consider that domestic violence," T.M. replied, "That will not happen. That was, like I said, every time he's on fricking cocaine or he smokes fricking crack, he acts totally violent and my kids are nowhere with me when he was doing that. She was with my sister and her boyfriend."[7]

T.M. agreed that on the day that H.M. injured C.M., H.M. had been either smoking crack or using cocaine and that H.M. had also injured her. When asked if she believed that "it endangers your child to continue a relationship with someone who smokes crack, becomes violent and beats you up," T.M. responded,

> I don't want—yes, it's very dangerous. Like I've been telling you guys, I don't want nothing to do with [H.M.]. All I want is my kids. I mean, my kids are safe with me. I don't want nothing to do with [H.M.], even when he comes out. As soon as he comes out and I find out he's out, I know exactly where he's staying. I'm going to put another protection order against him so he can't come near me or my kids.

T.M. acknowledged that she had a protective order against H.M. when she became pregnant with both her children. T.M. denied that the protective order was related to H.M.'s violent behavior.

T.M. stated that the following occurred on July 20, 2011:

> [H.M.] came home from work. I was washing the dishes. I just put [C.M.] to sleep. He—[C.M.] was five months. He was watched—I just put him asleep in his swing. [A.M.] was watching her Disney channel and

---

[7] It appears that T.M. meant that A.M. was with her sister and her boyfriend.

14

playing with her Barbies. And I was washing dishes and [H.M.] came home. As soon as he walked through that door, he started calling me a fat B and all this other stuff. And the next thing I know, he just went to the bathroom and sniffed. Well, he went to the bathroom. I didn't know he sniffed until he came out and his eyes were all big and bloodshot. And I told him, I said, you did that stuff while my kids were in the house and he got—he was like, yeah, I did. And I said, why did you do that when you know I told you—you promised me you wouldn't do this again. I said I—I said, you promised me you wouldn't do this again. He goes—he said, I'm sorry. He says, I'm frustrated, there's nothing I can, you know, I wanted to relax myself. I said you—I said, you've been changing because for the past four or five months, our relationship wasn't the same. He never came home. He was always out. There was even times where he would be gone for weeks at a time leaving me with the kids by myself. So he—

. . . .

We started yelling at each other, yes. Because I told him I'm going to call my sister to take me out of—so I can leave because you promised me. He broke the door, the phone, so I couldn't call my sister. And then on top of that, he blocked the door till like 3 o'clock in the morning. That's why we were arguing. I told him, you know what, I'm tired, I don't want to—I'm going to bed. So I took my daughter from her room and put her in my—in our bed. I told him, you stay over there in [A.M.'s] room. I got the kids here with me. I even took my son out of his crib that he was sleeping in in our room and put him in bed with me and [A.M.] because I didn't trust him to come in the room and grab my son and use that as a hostage or something. I didn't trust him at all.

So I did put my son in the bed with me and my daughter. And the next morning, my daughter woke up around 6 o'clock because she likes watching that Mickey Mouse House Club and that's when he got up around—he didn't get up till like two hours later. And when he got up, he started yelling at me telling me that he wished he was back with [F.B.] and all this other crap. And I told him, fine. I said, if you want to be back with her, go. And then that's when he's all like, you know, fine. And then he calmed down. And he said, you know what, I'm sorry, I didn't mean to argue with you or anything. And he told me—he's like let's go to the—run some errands real fast.

T.M. stated, "I bit him because he kept choking me. So I didn't bite him on his back. I don't know why he said bite him on his back. I bit him on his forearm where he has that tattoo, his gang tattoo. I bit him right underneath it because he had me in a

15

choke hold and that's the only way I can get him to release me." T.M. denied that A.M. was present during the physical altercation, but admitted that A.M. was present during the verbal argument. T.M. said, "And every time he would go after me, you will see—when he was yelling at me, my daughter would get in between us and start yelling and telling him to stop, to stop yelling at mommy, stop doing this because [A.M.] was a mama's girl. She protected me no matter what."

On the day that C.M. was injured, T.M. recalled that she put A.M. and C.M. in the car with H.M. C.M. was in his car seat. T.M. had forgotten A.M.'s sippy cup and C.M.'s bottle. T.M. said, "then when I went to go get the sippy cup and I came outside, then . . . the next thing I know, I see [H.M.] just like he didn't throw him out of the window, but he like threw him like, how can I say, like kind of like tossed the car seat on the ground." T.M. clarified that H.M. did not throw C.M. out of the window but threw C.M. out of the door. C.M. came out of his car seat and landed face first on the concrete. T.M. testified that when she picked C.M. up, he was not responsive. T.M. described the event as follows:

> It must have been a miracle or something because I was crying. I picked him up. I started crying. I yelled for the father [H.M.]. All he did was stop the car. Then he started driving off again. And I kept—like I was just holding him close to me, started crying for him to just please respond back to me. And finally, when the ambulance came, not the ambulance, when I was on the phone with the paramedic, that's when he started crying like out of nowhere. He was in my arms. He started crying and I was just like—was like, oh, thank God, you know, I'm like, oh, thank God, no, he's crying, but he—the father has my kid and all this other stuff and—

T.M. testified that she called for an ambulance, and C.M. was taken to Driscoll Children's Hospital. T.M. agreed that she told Corona that H.M. had thrown C.M. out of the car as described above. T.M. agreed that an unnamed witness who called 911 also

16

reported that H.M. threw C.M. out of the car. T.M. stated that she was fearful for A.M.'s safety and was "worried about [A.M.'s] life." T.M. testified that she was extremely scared of H.M. After the children were removed, T.M. went back to the apartment she shared with H.M. to retrieve her clothes. T.M. said, "It was my intention that night to [leave and never talk to H.M. again], but it never happened because [H.M.] wanted me to stay there because he wanted to make sure I was there at his trial to testify saying that he was innocent." T.M. stated that at the hospital she spoke to "a cop, the nurse, the detective, the three caseworkers from CPS that was there." T.M. testified she reported to each of those individuals that H.M. was a member of a gang and that she was fearful of him.

According to T.M., the next day, H.M. made her go to the police station and change her story. T.M. stated, "I said that he was innocent and that he didn't do it and I made something up. I can't remember what I made up. I made something up." T.M. said that H.M. was incorrect when he testified that she was running after the car and dropped C.M.'s car seat. T.M. believed that she told a similar story when she went to the police station. T.M. went home with H.M. after changing her story to police and continued to reside with him until he was incarcerated for injuring C.M. T.M. explained:

> Yes [I continued living with H.M], only because, like I said, [H.M.] did control my life. I'm going to say he did because he don't control my life no more. Even when he gets out, he won't. He controlled my life, like had everyone watching over me, like I couldn't even go somewhere without one of his friends running back to him and it getting back to him. And then later on that night after he heard from [H.M.], oh, where did you go, you did this, you did this. He called me all kinds of fricking names.

T.M. acknowledged that at H.M.'s trial for injuring C.M., she lied by testifying, "That I was running with [C.M]. I only said that because [H.M.] was there, and on top of

17

it, it was on the news.  The news camera was there.  So I was scared that if I said something, that I was going to get jumped or something after the trial, like after it got put on TV, that I was going to get jumped or something."  T.M. explained that she "lied" because "my kids needed their mom.  And if I would have told the truth while I was on camera, I know for a fact because he already told me that I probably wouldn't even be here right now."  T.M. claimed that she had to appease H.M. in order to ensure that she and the children were safe.

T.M. stated that after taking a psychological exam as part of her family plan implemented by the Department, she was ordered to go to family counseling, marriage counseling, anger management class, and parenting class.  T.M. testified that she and H.M. completed "all" of the required services.  When asked if she ever discussed her fear of H.M. at any of the sessions, T.M. replied, "I didn't—when he was with me, I wouldn't say nothing like that because that's probably all the time.  I think I told Mr., what's his name, Aaron.  I think I told Mr. Aaron Rhyne that—that when [H.M.] went to the bathroom or something, like I kind of like let him know how it was.  And I think Aaron Rhyne can tell by the way I was acting."  T.M. acknowledged that she had not attended individual counseling since H.M. was placed in prison.  T.M. was unsure if she was required to continue individual counseling because, according to her, the Department had not filed the proper paperwork.  T.M. did not inform her counselor that she was afraid of retaliation from H.M.'s gang.  T.M. stated that she had completed anger management class where she learned, "[t]o breathe, walk away, give each other space, count to ten."  When asked if she utilized her anger management skills when dealing with her uncle, T.M. said, "With my uncle?  Yes, but he kept following me telling me it's

18

his house, he'll go wherever he wants to." T.M. was ordered to pay fifty dollars per month in child support; however, she admitted that she did not make any payments because she did not know where to make the payments.

When asked if she felt responsible for what happened, T.M. replied:

> In a way, no. I didn't do anything, but if I would have listened to my sister and I didn't—and I wouldn't have come back down here, then yeah. My son and my daughter would not have been away from me because they were with me all the time. I think that's the only thing that I'm guilty of, but CPS won't give me a second chance so I can show them that I can be a good mom. Give me a chance so I can have at least weekend visits with them. That's what I've been fighting for, a weekend visit, but you guys keep denying weekend visits for me. I am a good mom. And the— what happened to my son, yeah, he wouldn't have gotten hurt if it wasn't for me coming back down here.

During cross-examination by H.M.'s attorney, T.M. acknowledged that she lived with H.M. after he threw C.M. out of the car and that they attended visitations with the children together. When asked if everything was "going fine" while she lived with H.M., T.M. replied, "No. Because we were arguing. Half the time, he wasn't there to see his little kids." T.M. reiterated that the protective order against H.M. issued when she was seventeen was based on her lies. However, when asked if she recalled stating that she stabbed H.M., T.M. responded, "I only stabbed him one time when he was choking me when I was 17. Even his mom saw the whole thing and I told him to let go of me or I'm going to stab him. And he told me go ahead and stab me."

T.M. again acknowledged that H.M. provided financial support to her and that she and H.M. stayed together with the intention of "mov[ing] forward together as a family once [they] got the children back." T.M. then stated that that plan belonged to H.M. and that although she told "them" (presumably the Department's employees and

19

her counselor) that that was the plan, "that wasn't [her] plan. [Her] plan was once [the children were returned to her, she] was going to go straight back to Oklahoma."

T.M. stated that she works at Dairy Queen and that her hours are flexible. T.M. pays her aunt $225 per month for rent. T.M. testified that she has already found a day care for her children. If the children were returned to her, T.M. said that they would live with her aunt until she saved enough money to afford her own residence. T.M. stated that she has family including five sisters, her father, her aunts, and some cousins in Corpus that would be able to help her. T.M. testified that she does not use drugs or drink alcohol; she has learned not to associate with people who get her in trouble; and plans to stay single.

On re-direct examination by the Department, T.M. explained that a man she had been dating after she ended her relationship with H.M. also physically assaulted her. She claimed that she ended the relationship with this man when her case worker informed her of his criminal history, which prompted the physical assault. T.M. stated, "Ever since then, I kicked [the man who physically assaulted her] out and I told him I didn't want nothing to do with him."

The trial court admitted a permanency plan and progress report generated by Juan Reyna who is an employee of the Department. In this report, Reyna states that allegations were made that there was a history of domestic violence and drug use in the children's home. The report documented that the permanency goal the Department had for the children was placement with relatives of either T.M. or H.M. The report states that although R.G. was willing to allow a home study, he eventually called the Department declining to become the children's caregiver.

20

In C.M.'s medical report admitted into evidence, the hospital personnel documented that T.M. described the event leading to C.M.'s injury as follows:

> Mother states that when she was walking toward the car she saw as father tossed the pt's carseat with pt inside. Mother states "the carseat went one way and [C.M.] went the other way." Mom said pt fell out landing face down onto concrete. Mother states the car seat landed next to pt. Mom said pt was "quiet" as he lay on the concrete "until I picked him up." Mom said she picked up pt and "tickled his sides." Mom denied any shaking, squeezing, or blowing to the face. Mom said pt opened his eyes began to cry at this point. Mother states father fled the scene taking their 2 y/o with him in the car. Mother states she fears for her daughter['s] safety.

C.M.'s medical records include a "Social Work Psychosocial Assessment for Suspected Abuse," signed by Belinda M. Loera, L.M.S.W., the social worker who interviewed T.M. It states that T.M. told the hospital personnel that H.M. had done "a lot" of cocaine the night that they argued. T.M. estimated that H.M. "did four to six lines." The record documents the following:

> Mother states father also hit her last night. Mother states father "jumped on her back" and started hitting her. Mother states that she tried getting him off her and she bit him "in self defense". Mother states father has been hitting her since she was pregnant with her first child. Mother states she wants to leave pt's father and move out their home but she was waiting for her SSI appointment. Mother states that she "cant read or write" and she's waiting to hear back from Social Security regarding her disability. Mom later stated "I'm leaving him now after this. I never thought he would do this to the kids." Mom reported that she smoked marijuana "a long time ago. About one to two months ago." The hospital personnel further documented that "Per nursing notes, it appears that mom was observed to be in the phone instructing someone to tell 'him to get rid of the shit' because CPS is involved."

Loera also noted that

> It appears that there has been domestic violence within this family for several years. Last occurrence was this morning. There is also a concern that dad has possession of cocaine at this time, using it last night. Mom reported that she desires to leave dad however must wait until she is able to attend her SSI appointment. Due to this statement, it is questionable

whether mom will provide a safe environment upon discharge.  At this time, it is unknown where father or the sibling are.

Jose Luis Enriquez, MD., a physician who treated C.M., made the diagnosis that C.M. suffered "[b]lunt head trauma[,] [c]hild physical abuse[, and] [h]ead injury, unspecified."  In her report, Nancy Sanders Harper, M.D. stated that T.M. told her that H.M. had thrown C.M. out of the car after they argued and that H.M. drove off with A.M.  Dr. Harper wrote:

> The mother reports that the father has smoked marijuana and she tells him 'to do it away from the kids.[']  The mother reports that 'last night he did a line' and he doesn't listen to me, he's 35[].[']"  After conducting her evaluation, Dr. Harper documented her impressions, including that "there is neglect from drug exposure in the home (both the father's use of cocaine and both parents' use of marijuana).

The trial court admitted a permanency plan and permanency progress report signed by a caseworker and supervisor and dated October 10, 2011.[8]  In the progress report, the caseworker documented that T.M. told Detective Daniel Rodriguez that H.M had thrown C.M. out of the vehicle after they had argued.  The details T.M. gave are consistent with those documented by other person's as set out above.  The caseworker stated that Investigator John Diaz brought A.M. to the hospital and that A.M. was wrapped in a urine soaked towel instead of wearing a diaper.  The caseworker documented that the following had occurred:

> At approximately 6:30PM the Department contacted paternal grandmother [S.S.] via phone.  [S.S.] indicated that her son [H.M.] dropped [A.M.] off at her home and stated that he had to go to work. [S.S.] indicated that [H.M.] did not provide any diapers for [A.M.] or any instruction on when she would be picked up.  [S.S.] stated that she did not want to care for [A.M.] and refuses to care for any children that are not her own.

---

[8] The signature of the caseworker appears to be that of Juan Reyna.

22

The caseworker stated that T.M. had admitted "to continued use of illegal substances while being the primary caretaker of the children" and of "allowing continued drug use by [H.M.] in the home, while the children were present." The report states, "Per statement of [T.M., H.M.] has continued to use cocaine and marijuana while in the presence of the children." The report indicated that T.M. and H.M. had complied with drug testing and neither had tested positive. The report stated that H.M. had been referred to substance abuse recovery services after a drug assessment; however, H.M. failed to participate and complete the program due to a conflict with his work schedule. The caseworker indicated that he was looking for another program that would not conflict with H.M.'s work schedule.

In two review hearing orders dated January 10, 2012, and January 23, 2012, the trial court concluded after a hearing that the children could not be returned to T.M. and H.M. In a review hearing report, the caseworker documented that H.M. was convicted of injury to a child for injuring C.M. and had received five years' imprisonment. The caseworker stated that his supervisor Brienna Beach told him that T.M. has stated that she no longer wished to visit with the children for two hours and only wanted to visit with them for one hour

> because [C.M.] looked like [H.M.] and she was going to miss him so much.
> During the whole criminal court hearing, [T.M.] kept blaming herself for
> everything that [H.M.] was going through. [T.M.] stated, '[H.M.] is a good
> guy and he does not deserve to serve so many years in prison because [it]
> is my fault that he will be going to prison!' [T.M.] states that [H.M.] is not
> guilty.

The record reflects that after another hearing held on March 7, 2012, the trial court entered a review hearing order stating "The Court finds that neither the children's parents nor any other person or entity entitled to service under Chapter 102, Texas

23

Family Code is willing and able to provide the children . . . with a safe environment, and therefore return of the children to a parent or other person or entity is not in the children's best interest." In the order, the trial court ordered T.M. and H.M. to comply with the permanency plan as set out by the Department.

A permanency plan and progress report to the court dated May 1, 2012 and signed by caseworker Reyna indicates that although family reunification was a permanency goal, T.M. had "failed" to have stable employment and housing. It states that currently T.M. did not have a job or a house to live and that "her ability to take care of her children is limited." The report indicates that H.M. had been charged with injury to a child and was currently incarcerated. The concurrent goal of the Department for the children was fictive or kin adoption. However, Reyna indicated that there were barriers to that goal because neither H.M. nor T.M. had "provided any family available or willing to be able to take care of the kids."

In a previous order dated November 8, 2011, the trial court ordered T.M. and H.M. to comply with the family plan as directed by the Department. The trial court further ordered T.M. and H.M. to pay $50 per month in child support and notify the caseworker of any address or phone change within five days. The family plan required T.M. and H.M. to provide financial support to the children.

On June 12, 2012, in a document entitled, "Notice to the Court," Reyna stated that R.G. had called to inform him that he no longer wished to be considered as a caretaker for C.M. and A.M. According to Reyna, R.G. told him that T.M. had physically attacked him and threatened him with a knife and threatened to commit suicide.

R.G. further indicated that he had evicted T.M. from his home because he overheard her telling H.M.'s ex-girlfriend that he had verbally abused T.M., which he claimed was a lie. R.G. told Reyna that he also overheard T.M. tell H.M.'s ex-girlfriend that she was "using" R.G. to get her children back. R.G. stated that he felt threatened and was afraid that T.M. had given his address to H.M's ex-girlfriend so that she could give it H.M. Based on this information, the Department requested a hearing and termination trial.

In a permanency plan and progress report dated July 23, 2012, the Department's permanency plan had become either kin adoption or unrelated adoption. In the report, Reyna documented that T.M. had no residence and had continued "to move from place to place and has no job or financial assistance which puts her children at risk if placed with her." Reyna explained that T.M. had failed to provide the Department with proof of a job or a place to live. Reyna stated that "[t]he Department feels a termination trial and unrelated adoption is the best interest for the children."

Reyna documented that T.M. had stopped attending individual counseling and that the Department wanted her to continue attending counseling because according to R.G., she had threatened to commit suicide. According to Reyna, since she had moved back to Corpus from Oklahoma on July 3, 2012, T.M. had not requested visitation with her children. Reyna stated that T.M. was having a relationship with a man who had an extensive criminal record and that T.M. believed that the man was not a "bad person."

In a recommendations section of the July 23, 2012 progress report, Reyna documented that although H.M. was found guilty of injuring C.M., he continued to maintain that he had been convicted for something he did not do. The report states that

25

during cross-examination at H.M.'s criminal trial, T.M. "blamed herself" and said that "she dropped the baby while chasing" H.M. Reyna documented that after H.M. was convicted, T.M. stated that the "jury was stupid" and that "she will never blamed [sic] [H.M.] for the incident because it was all her fault."

In a family service plan evaluation dated September 18, 2012, under the heading, "new concerns," Reyna stated that T.M. "keeps putting herself in a violence [sic] environment" and that she was having a relationship with a man she accused of "sexually assaulting her back in April." According to the report, T.M. continued to associate with F.B., despite her accusations that F.B. stood as a lookout while several gang members raped her. Reyna documented that the Department had the following concerns: (1) T.M.'s lack of parenting skills; (2) it was unclear what had happened to C.M. because T.M. changed her stories several times; (3) H.M.'s prior involvement in a gang; and (4) domestic violence in the home.

The trial court admitted into evidence H.M.'s criminal record showing that H.M. pleaded guilty to violating the protective order on July 19, 2010. H.M.'s criminal record indicates that police incident reports had been generated by various police department personnel showing that H.M. and T.M. had continued to remain in the relationship despite the protective order. In a report dated November 24, 2009, the officer set out that T.M. reported that H.M. had physically assaulted her by punching her in the face with a closed fist, pushing her against the bed, and choking her. The officer reported that he observed blood on T.M.'s face. The officer also documented that T.M. had an active protective order against H.M. at the time of the attack that expired on March 25, 2010. The officer attested that there was probable cause to arrest H.M. for violation of a

26

protective order. According to the officer, when she called 911 for assistance, T.M. "STATED THAT HER BOYFRIEND BEAT THE SHIT OUT OF HER AND HER 6 MONTH OLD CHILD IS STILL INSIDE THE HOUSE. SHE SAID HIS NAME IS [H.M.]. SHE ADVISED THAT HIS MOTHER AND FAMILY KICKED HER OUT OF THE HOUSE. SHE ADDED THAT SHE HAS BEEN LIVING THERE." The officer documented that on November, 11, 2009, he contacted T.M. and that she refused to give a statement or press charges against H.M. because he is the father of her child. In a note on the report, the officer stated that six prior family violence incidents had been documented between T.M. and H.M. and the officer attached reports from the other incidents to his report.

In one of the attached reports, the officer documented that T.M. called police for assistance on February 19, 2008 after allegedly being assaulted by H.M. The report states the following:

> Dispatched to 4929 Weber in reference to an assault not in progress. Upon arrival I contacted the victim who advised that she was at [H.M.] offender[']s residence when she attempted to leave because she doesn't want to be with the offender anymore. When she attempted to leave he grabbed her by the throat and began to choke her leaving several bruises on her neck. He then pushed her and hit her in the left side of the face with his clentched [sic] fist causing redness to the left side of her check and eye. This caused her pain. She was able to getaway and went to her residence where she spoke with her sister and decided to call the police. Victim is semi-mentally challanged [sic] and has a difficult time explaining details. Victim fears for her safety because the offender is a prison gang member and has stated to the victim he would harm her and her family if she leaves the offender. An assault victim[']s statement form was completed.

In a police report filed on April 9, 2008, the officer documented the following:

> Offender [H.M.] and victim [T.M.] have been separated since March of this year. A Family Protective Order was issued out ot [sic] the 148th District Court prohibiting any contact with the victim by the offender. The order

27

was issued under cause number 08-1276F and will expire on March 25, 2010. The offender came to the house to see the victim. The witness would not allow him access to the house. The offender claimed she had some of his clothes. The protective order was issued when they lived on Weber Rd. and she has since moved to the current address. The offender then started making threats that his gang would take care of them. The offender was gone before police arrival.

Corona, an investigator for the Department, testified that when she interviewed T.M. at Driscoll Children's Hospital, T.M. told her that "she witnessed [H.M.] throw [C.M.] from the vehicle in the car seat" and that T.M. indicated that H.M. is in a gang. Corona stated that T.M. told her that H.M. had done cocaine on the previous night and that he had not slept. Corona testified that both H.M. and T.M. had "admitted to ongoing drug use in the home and around the children. They both admitted to domestic violence between the both of them in the home and because of the injuries that had occurred [to C.M.] that day." Corona believed that A.M. had also been in danger the day C.M. was injured because H.M. had thrown C.M. from the car, had ingested cocaine, and had driven the vehicle with A.M. According to Corona, the next day, T.M. and H.M. went to her office and T.M. "changed her story as to what happened to [C.M.]." Corona said, "[T.M.] indicated that she was the one that had [C.M.] in the car seat, that she ran after the vehicle with [C.M.] in the car seat and then [C.M.] fell out of the car seat while she chased the vehicle." Corona stated that T.M. never indicated that she was afraid of H.M. and if T.M. had indicated fear of H.M., the Department would have made "sure that they were all—her and the children were placed in a secure environment . . . ." Corona opined that even if C.M. had been injured as described by T.M. in the second scenario, the Department's position is that the children were in danger. On redirect-examination,

28

Corona stated that T.M. indicated that the domestic violence had occurred during "[t]heir entire relationship."

On cross-examination, Corona testified that the children were in danger even if the second scenario occurred because "the actual injury just brought to light the other incidents in the home, which was the continued drug use that both parents were aware of that the opposite parent was doing. Plus also, the domestic violence that had continued and both admitted to." Corona clarified that the drugs that the parents admitted using were cocaine and marihuana. Corona stated on cross-examination by T.M.'s attorney that T.M. admitted to using marihuana and "also admitted to knowing that [H.M.] was using cocaine in the home and using mari[h]uana around the children." Corona acknowledged that T.M. passed a drug test at Driscoll Children's Hospital on the day that C.M. was injured.

Detective Daniel Rodriguez testified that T.M. told him that H.M. had ingested cocaine in the presence of the children and that she and H.M. had argued about his cocaine use. Detective Rodriguez stated that T.M. told him that the next day, she put C.M. in the car seat because the couple was going to run errands together, that she forgot something in the house, went back to retrieve it leaving C.M. in the vehicle, and that when she returned, she saw H.M. throw the car carrier with C.M. out of the vehicle. The Department's attorney asked Detective Rodriguez if he knew "if there were any witnesses to the event," and he replied, "That's correct." When asked if the witness reported the same facts as described by T.M. to the 911 dispatcher, Detective Rodriguez responded, "Yes."

According to Detective Rodriguez, H.M. then visited his office and told him that T.M. had lied when she said he threw C.M. from the vehicle and that T.M. actually had caused C.M.'s injury. Detective Rodriguez stated that although H.M. offered to take a polygraph test and a date had been set, H.M. failed to take the test. According to Detective Rodriguez, T.M. then visited him and told him that "she was actually carrying the baby in the car carrier and was running after [H.M.] as he was driving away and the baby had fallen out and hurt himself that way." T.M. did not tell Detective Rodriguez that she was afraid of H.M., if she had, Detective Rodriguez said that the police would have "step[ped] in" to "take [T.M.] out of that environment."

When asked if based on his training and experience, he believed that H.M. knowingly placed his children in a dangerous environment, Detective Rodriguez said, "Yes. On the day of that occurrence, yes, he did." Detective Rodriguez also believed based on his training and experience that regardless of which story was correct, T.M. placed the children in danger. Detective Rodriguez stated that his testimony was consistent with the testimony he offered at H.M.'s criminal trial for injury to a child.

Detective Rodriguez testified that he conducted an audio recorded interview with T.M. at Driscoll Children's Hospital because he was worried that T.M. might change her story and it is not uncommon that individuals in T.M.'s situation to "be more truthful at the beginning of the occurrence." On cross-examination, Detective Rodriguez stated that he did not believe that T.M. had lied to him at Driscoll Children's Hospital. Detective Rodriguez acknowledged that he worked on cases where the mother was the offender and lied about how the child was injured.

30

Reyna testified that he is a "conservatorship worker" meaning that after the Department conducts the initial investigation and the children are removed, he "take[s] over and . . . get[s] the children either in foster care or with the relative placement. We start doing services." Reyna first came into contact with T.M. at an adversary hearing in August 2011. Reyna stated that at that time, H.M. and T.M. were living together. Reyna testified that T.M. took a psychological exam, but she did not "follow through with the recommendations," which included that T.M. attend a psychiatric consultation. Reyna explained that it was the Department's position that by not following through with this recommendation, T.M. did not "fulfill" a court-ordered task. Reyna testified that neither T.M. nor H.M. have made child support payments as required. It was also recommended that T.M. complete her GED, and she did not do so. Reyna further stated that T.M. has not complied with the court order to provide a stable home environment for the children.

Reyna stated that at the time that the psych evaluation was conducted, T.M. "started moving around and it was hard for me to find her. So she never really completed anything else." According to Reyna, it was recommended that T.M. participate in six months of psychotherapy services, however she did not do so. Reyna believed that T.M. did not complete psychotherapy because she moved around too much. Reyna testified that T.M. began moving around when H.M. was incarcerated. Reyna stated that there were long periods of time when he attempted to contact T.M. but was unable to do so.

Reyna stated that T.M. told him that when she was visiting her father in the hospital, T.M. and F.B. argued. According to Reyna, T.M. said that in August 2012, she

31

"ended up" "grabbing [F.B.] from the hair and pulling her down. And then the police were called after that." Reyna explained that T.M. had already completed anger management when she had the physical altercation with F.B. Reyna testified that T.M. never complained to him of any physical violence concerning R.G. but that R.G. reported violence. Reyna agreed that the Department had concerns about T.M.'s ability to demonstrate what she has learned in the anger management classes. Reyna also affirmed that the Department would be concerned about placing the children with T.M. because she has a recent history of placing herself in "dangerous violent situations."

The Department asked Reyna if he had any concerns about T.M.'s parenting ability and demonstrating what she has learned in parenting class, and Reyna explained that he witnessed several times that T.M. was not able to "control both of the kids." Reyna testified that T.M. has been consistent with her visitations with the children. When asked if he had any personal knowledge of T.M. "bringing people with her to the visits that are concerning," Reyna replied,

> Yes, I have and I witnessed this. I was supervising a visit, and right after the visit, what we do is we meet the foster mom in the lobby and provide her with the kids. And then we tell mom to go home after that. Well, when I'm walking out with the kids and I see [T.M.] approaching this young lady that was—apparently, she was introducing [A.M.] to this young lady. I was trying to look at her face, but she kept hiding her face at me. And I was—I kept, you know, I stayed there in the lobby. I let foster mom get the kids. And I noticed . . . this young lady looking at foster mom, you know, but I said, okay, well, I'm just going to, you know wait and see who this young lady is. I'm going to wait till foster mom leaves. Foster mom left. They went into the rest room, waiting in the lobby and then they came out, and I looked at her and it was [F.B.]. When [F.B.] came out, she kept hiding her face and she was kind of dragging [T.M.], come on, let's leave, let's leave. And I did approach [T.M.] and I said, [T.M.], I have bus tokens that day, actually bus pass that day. I said, do you need a bus pass and she said, oh, no, no, no, I don't need anything. And I questioned her, why are you with [F.B.] after you stated that she's a danger for you. You know,

32

she said, oh I'm just with her and she ran off, you know, with [F.B.] in the parking lot.

Reyna did not recall the exact date of this occurrence; however, he said that it occurred after an August 2 hearing where T.M. testified that [F.B.] was dangerous. On cross-examination by the children's attorney ad litem, Reyna said that T.M. and F.B. appeared to be "good friends" and there was no indication that T.M. was fearful of F.B. When asked if he believed based on his training and experience if T.M. "would have people over that she shouldn't have over to her home while the children were present," Reyna responded, "Yes. Yes, I do." Reyna believed that T.M. put other people ahead of her children.

According to Reyna, the Department was also concerned about T.M.'s relationship with her new boyfriend. Reyna stated that this individual tested positive for cocaine and marihuana. Reyna continued:

> And [T.M.]—when she came back from Chicago, she met with me and my supervisor and she stated, I mean, she was honest. She said, I am dating somebody else and she told us who he was . . . . And I met him once when he came with her to the visit. That's when I decided to drug tested him. And then from there, he—I went to the place where she lived in Norton. This was the place right when she moved back. And I—he was there. He was actually a neighbor of hers. And I spoke to him.

Reyna discovered that T.M.'s boyfriend had a criminal record, and Reyna then discussed the boyfriend's criminal background with T.M.

Reyna explained that the Hope House would have been suitable housing for the children to live with T.M.; however T.M. was evicted from Hope House on January 21, 2012. Reyna stated that after Hope House, T.M. moved to a hotel for about a week, then she moved to Kingsville with her sister, and then she moved in with F.B. Reyna recalled that T.M. lived with F.B. for approximately two weeks, and T.M. had requested

33

for the Department to place the children with her there. Reyna said that T.M. then moved across the street from F.B., and she stayed in that residence until she was assaulted. T.M. then moved in with R.G. in Chicago.

According to Reyna, the Department completed the home study of R.G.'s residence and the residence would have served as suitable placement for the children. T.M. then moved to Oklahoma with her biological mother. Reyna stated that T.M. failed to provide information concerning her biological mother's background. When asked, Reyna agreed that T.M.'s biological mother's parental rights had been terminated and T.M. was then adopted. Reyna agreed that generally the Department does not recommend placement of children in a home with people who have had prior terminations. T.M. returned to Corpus Christi in June 2012. Reyna stated that T.M. moved to a residence on Norton, which was a suitable place for the children. Reyna did not recall exactly where T.M. moved next stating, "Honestly, I don't. I—she ended up moving from Norton and then she was—I'm trying to remember everywhere else that she moved. She moved from there, ended up going to her sister, but really honestly, we never, never got the reason she moved [from Norton]. Yes."

T.M. asked Reyna to visit her aunt's house; however, according to Reyna, T.M. had previously never mentioned this aunt to him; and although he requested information about the aunt in order to conduct a "CPS criminal history" check, he has not received any information from T.M. Reyna testified that the Department wanted this information because once it is determined that a family member does not have a criminal history, the Department can place the children with that family member. Reyna stated that T.M. has had fifteen months to find suitable and stable housing with three acceptable

34

opportunities that she did not take. Reyna agreed that it was the Department's position that T.M. and H.M. placed the children in danger and that it was in the children's best interest that their parental rights to A.M. and C.M. be terminated. When asked to explain why it was in the children's best interest that the parental rights to be terminated, Reyna said, "First of all, they deserve a stable environment. They deserve their children to be adopted. If the children are adopted, of course, they will receive Medicaid until they're 21. They will receive reimbursements for college. I mean, I do feel they deserve permanency, safe and stable home. That's the reason." Reyna stated that he believed that the Department had made "reasonable efforts to return the children" to T.M.

Reyna testified that the children were currently both living with their foster parents, have resided there during the pendency of the case, and the foster parents' home has been a stable environment where the children's needs have been met. On cross-examination by T.M.'s attorney, Reyna acknowledged that A.M. broke her leg while living with her current foster parents and that "in the beginning" of the case, the children were removed from another foster home. Reyna acknowledged that there had apparently been "sexual allegations as to [the former] foster parents"; however, "it was all ruled out in the beginning," but in an abundance of caution, A.M. and C.M. were removed "and immediately placed" in the current foster home. Reyna agreed that the trial court had a variety of options regarding the children aside from termination of parental rights, including allowing the foster parents to be the permanent managing conservators, while allowing T.M. supervised visitation or no visitation and requiring that she pay child support.

On re-direct by the Department, Reyna testified that children deserve permanency and a safe and stable home. Reyna stated he was aware that "the law allows the parent one year to do their services and get their children back" and that T.M. has had fifteen months to do so, but has not provided a stable home. On re-cross examination by T.M.'s attorney, Reyna reiterated that although T.M. has a job, she has not provided the required information concerning the people who reside with her. Reyna explained that the Department has been unable to conduct the "preliminary checks" and that he is unable to determine whether the home is or is not stable:

> [b]ecause we—I visited the home with CASA, and pretty much, we asked for info, what is your name, can we at least know who you are and the lady there, she said no, I mean, I will not provide you with any info, I do not want to deal with CPS, so I will not provide you with any info. And therefore, I don't know who she is, do not know her name. I know according to [T.M.], that's the aunt, but I do not know who she is.

Reyna explained that he defines "stable" as "[a] place without criminal—without no CPS history, no criminal background, no drugs. . . . I don't know if there's criminal history. I don't know if there's CPS history."

Marilyn Sauceda, the CASA volunteer, testified that T.M. gave her an address on Craig Street for her to visit because T.M. wanted to live there with the children. Sauceda stated that although she was able to drive by the residence, she did not go inside because when she went, "they" would not let her in. Sauceda testified that T.M. told her that the reason she was not allowed in the residence was because F.B. did not want any personnel from CPS in her home. Sauceda did not know whether T.M. had a stable home and her last contact with T.M. was two weeks prior to the trial. Sauceda stated that she visited another home where T.M. wanted the children to be placed; however, Sauceda was "concerned" about that home. Sauceda explained that she is

36

concerned because she did not know who lived in that house and it was not a permanent home.

Sauceda testified that the children currently live with a foster family where their physical and emotional needs are being met. Sauceda had no concerns regarding the foster home and stated, "It's a safe environment." Regarding returning the children to T.M., Sauceda is concerned that there is no permanent home because T.M. has "moved several times and some of the areas are not safe or the individuals that she's associated with are not—would put them in danger." Sauceda believed that it was in the children's best interest to terminate the parental rights because

> Over the course of this 15 months, I do not believe that [T.M.] has demonstrated the ability to provide the children with a safe, permanent home. And I think that her associations with particular individuals endanger her—I think her judgment and her codependency on others also affects her decisions in putting those children in dangerous—potentially dangerous areas.

K.H., the children's foster mother, testified that she is currently married to the children's foster father, F.H., and they have had custody of the children since October 20, 2011. K.H. and F.H. do not have any children and decided to become foster parents because they "really love children." K.H. understood that being a foster parent could potentially be a temporary arrangement and that her duty as a foster parent was "to take care of the children until their parents are able to take the children back."

When K.H. and F.H. received the children, C.M. was eight months old and A.M. was about two and a half years old. According to K.H., A.M. was not "very social" at first and "did not like to be around men." K.H. said that, for example, her husband could not "even hand her a sippy cup for the first probably two weeks." K.H. explained that A.M. "came out of it" in about one month. K.H. takes A.M. to school at 7:30 where she

37

eats breakfast, lunch, and a snack. K.H. retrieves A.M. at 2:45 or 3:00. C.M. wakes up at 7:00, eats breakfast, and then K.H. and C.M. have playtime. K.H. takes C.M. to the park and on Tuesdays they attend story time at the library. After she retrieves A.M. from school, three times per week, K.H. takes the children to the CPS office for visitation with T.M.

K.H. does not work, and F.H. works for the Department of Public Safety as an investigator. K.H. and F.H. have lived in their home for about three years. A.M. is involved in Sunday School and Vacation Bible School. A.M. also assists during the ceremony at church by carrying the light of the church at the beginning of the service and "after the offering is picked up, she's the one that takes it to the alter with help . . . . then at the end of the service . . . .," she helps to turn off the candles.

K.H. believed that the children deserved permanency and that permanency was in their best interest. K.H. did not believe it would be wise to allow T.M. visitation with the children while they had custody because of "[t]he instability and it's hard on the kids to go back and forth. I think, if you know, in so many years, if she were able to get her life together, I mean maybe in several years, I would share pictures maybe in holidays, but as far as visitation, I just don't think that that's appropriate." On cross-examination by the children's attorney ad litem, K.H. stated that there is no violence in her home, no drug abuse, and no alcohol. K.H. has bonded with the children and testified that she feels as if the children are her own.

On cross-examination by T.M.'s attorney, K.H. stated that she believed that the children would be in a "negative environment" if the children had visitation with T.M.; therefore, she did not want the children to have contact with T.M. anymore. K.H.

38

testified that the children "have never asked for their mother in the year that [she has] had them, not one time.  Not since day one."

On re-direct examination, K.H. described an event that caused her concern.  K.H. said that T.M. brought F.B. to a visitation and asked A.M. if she remembered her.  K.H. explained that "it's very concerning that she would even bring [people such as F.B.] to the CPS office.  It's very scary."  K.H. was also concerned about H.M.'s connection with a gang because "it's not only a danger to the children, it's a danger to my family and my safety."

## B.    Discussion

By their first and second issues, T.M. and H.M. contend that the evidence is legally and factually insufficient to support the finding that either parent knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being.  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).  By her third issue, T.M. contends that the evidence is legally and factually insufficient to support a finding that she has failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children.  *See id.*

> Endangerment means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987);

39

*see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *D.T.*, 34 S.W.3d at 632. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77; *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83–84 (Tex. App.—Dallas 1995, no writ). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. Tex. Fam. Code Ann. § 161.001(1)(E); *D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.).

However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. To determine whether termination is necessary, courts look to parental conduct both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). . . . Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct as well. *Dupree*, 907 S.W.2d at 84. A parent's attempt to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *See In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.).

*In re J.T.G.,* 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Based on the evidence as set out above, the jury could have formed a firm belief or conviction that: (1) there was a continuing pattern of domestic violence between T.M.

and H.M. in the home while the children were present and that T.M. and H.M. failed to shield the children from the violence; (2) both T.M. and H.M. ingested drugs while the children were present and that neither prevented the other from doing so; (3) H.M. ingested cocaine by sniffing it and smoking it; (4) H.M. became violent while under the influence of cocaine; (5) T.M. committed acts of violence by attacking her uncle with a knife and attacking F.B. by pulling her hair; (6) T.M. threatened to commit suicide and refused to continue her individual counseling and psychotherapy; (7) H.M. threw C.M. in his car seat onto the pavement and C.M. fell face first on the concrete; (8) C.M. was injured and was unresponsive after the fall; (9) H.M. did not take responsibility for injuring C.M. and bullied T.M. into changing her story to avoid prosecution; (10) H.M. was either a member of or associated with a gang that threatened T.M.; (11) H.M. threatened to kill T.M.; (12) T.M. lied at H.M.'s criminal trial concerning what happened to C.M.; (13) T.M. admitted to deceiving the trial court regarding whether R.G. would actually be the children's caregiver; (14) T.M. complained that she believed that R.G. sexually assaulted her, yet she failed to provide that information to the trial court when it was determining whether to grant custody of the children to R.G.; (15) although T.M. testified that R.G. allegedly sexually assaulted her and verbally and physically abused her, she wanted her children placed in his home; (16) T.M. acquired a protective order after H.M. attacked her; (17) H.M. violated the protective order by continuing his relationship with T.M. and physically attacking her on several occasions; (18) T.M. continued her relationship with H.M. despite the protective order and H.M.'s abuse; (19) T.M. was not credible when she stated that she would no longer associate with dangerous individuals including H.M.; (20) H.M.'s gang affiliation was a danger to the

41

children; (21) H.M. ingested cocaine, did not sleep, and then drove his vehicle with A.M. in the car; (22) T.M. continued her relationship with H.M. after he threw C.M. out of the vehicle; (23) T.M. planned to live with H.M., even after he was convicted of injuring C.M.; (24) T.M. and H.M. placed both children in danger on the day H.M. injured C.M.; (25) H.M.'s parental rights to his daughter from a previous relationship had been terminated; (26) H.M. does not support his other children; (27) H.M.'s former girlfriend does not allow him to contact his two other children and he does not have a relationship with those children; (28) T.M. had not provided a stable environment for her children to live during the fifteen months she had been completing her services with the Department; (29) T.M. allowed F.B., a person she described as "bad news" and a person she accused of assisting gang members rape her, to visit with her children; (30) H.M. was a danger to the children; (31) neither T.M. nor H.M. complied with the court order to provide child support in the amount of $50 per month; (32) T.M. failed to complete her family service plan by failing to continue individual counseling and psychotherapy; (33) H.M. failed to complete his family service plan by failing to attend the drug treatment program; (34) Neither T.M. nor H.M. took responsibility for what happened to C.M.; (35) T.M. is in a new relationship with a man with an extensive criminal history and who physically assaulted her; (36) hospital personnel overheard T.M. telling someone over the phone to "'tell him to get rid of the shit' because CPS is involved"; (37) there was neglect of the children from T.M.'s use of marihuana and H.M's use of cocaine and marihuana; (38) even after H.M. was convicted of injuring C.M., T.M. stated that he is a "good guy" and that "he does not deserve to serve so many years"; (39) T.M. failed to notify the Department of her whereabouts and how to

42

contact her during the pendency of the case; (40) T.M.'s and H.M.'s violent behavior endangered the children's well-being; (41) T.M.'s use of marihuana endangered the children's well-being; (42) H.M.'s use of marihuana and cocaine endangered the children's well-being; and (43) the home environment which included continuous drug use and domestic violence endangered the children's well-being.

We conclude, based on these findings, that there was clear and convincing evidence that T.M. and H.M. (1) knowingly placed or knowingly allowed A.M. and C.M. to remain in conditions or surroundings which endangered their physical or emotional well-being, *see* TEX. FAM. CODE ANN. § 161.001(1)(D), and (2) engaged in conduct or knowingly placed A.M. and C.M. with persons who engaged in conduct which endangered their physical or emotional well-being, *see id.* § 161.001(1)(E). We further conclude that there was clear and convincing evidence that T.M. (1) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of A.M. and C.M. because she did not provide child support as ordered and did not provide a stable home for the children, and (2) the children had been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the children's removal from the parents under Chapter 262 for the abuse or neglect of the children, *see id.* § 161.001(1)(O). Accordingly, the evidence was legally and factually sufficient to support the jury's finding that T.M. and H.M. violated section 161.001(1) of the family code. We overrule T.M. and H.M.'s first and second issues.[9] We also overrule T.M.'s third issue.

---

[9] Because we have determined that H.M. violated section 161.001(D) and (E), we need not address H.M.'s other issues challenging the termination grounds pursuant to section 161.001(1)(L) and (Q). *See* TEX. FAM. CODE ANN. § 161.001(1)(A–T) (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

43

## IV.    BEST INTEREST OF THE CHILDREN

Having found that there was clear and convincing evidence that T.M. and H.M. violated section 161.001(1), we must now determine whether termination was in the children's best interest.  *See* TEX. FAM. CODE ANN. § 153.002.  Although T.M. contends by her fourth issue that the evidence is insufficient to support the jury's finding that termination of her parental rights was in the children's best interest, H.M. does not challenge that finding.

When considering whether parental termination is in the child's best interest, the following non-exhaustive list of factors should be considered:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent.  *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).  The party seeking parental termination is not required to prove all nine factors.  *In re C.H.*, 89 S.W.3d at 27 (providing that these considerations are not exhaustive, "or that *all* such considerations must be proved as a condition precedent to parental termination") (emphasis in original); *In re J.R.S.*, 232 S.W.3d 278, 284 (Tex. App—Fort Worth 2007, no pet.) ("These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.").

44

Although there is a strong presumption that it is in the child's best interest to allow the natural parent to retain custody, when confronted with evidence to the contrary, that presumption disappears. *In re A.I.G.*, 135 S.W.3d 687, 692 (Tex. App.– San Antonio 2003, no pet.). Evidence proving one or more of the statutory grounds for termination may be probative in determining that termination is in the best interest of the child. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). A best-interest analysis may be based on direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence as a whole. *In re T.N.*, 180 S.W.3d 376, 384 (Tex. App.—Amarillo 2005, no pet.) (citing *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.)). "A parent's unstable lifestyle, lack of income, and lack of a home may also be considered in a determination of a parent's ability to provide for a child's emotional and physical needs and may also threaten the physical well being of the child." *Id.*

Here, the children were too young to express their wishes or desires. Concerning the physical and emotional needs of the children now and in the future, the evidence established that the children were exposed to continuing domestic violence and drug use in the home by both parents, which threatened the children's emotional future. T.M. testified that "every time that [H.M.] would go after" her, A.M. "would get in between" the couple and plead with H.M. to stop. From this, the jury was free to infer that A.M.'s emotional needs were being ignored by T.M. and H.M. while they engaged in their violent disputes. The record shows that H.M.'s and T.M.'s violent behavior had continued despite a protective order, despite numerous police interventions, and despite the Department's efforts to provide services to them. In contrast, there is no evidence

45

that the children's foster parents engaged in any violent behavior or used drugs. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ). The goal of establishing a stable, permanent home for a child is a compelling interest of the government. *Id.* Here, the jury heard evidence that T.M. had not been able to establish a stable home for the children despite numerous attempts by the Department to assist her. Thus, the jury could have reasonably found that the children's present and future physical and emotional needs were better served by allowing the children to be adopted by their foster parents rather than returned to T.M.

Regarding the emotional and physical danger to the children now and in the future, the jury found that T.M. knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. As stated above, the evidence showed a pattern of violent behavior by T.M. and H.M., culminating in H.M. throwing C.M. onto the pavement. There is evidence of the parents' continuing drug use and evidence that the drug use led to neglect of the children and to C.M.'s injury. Moreover, T.M. failed to recognize that her behavior in any way led to the removal of the children. Based on the evidence, the jury was permitted to infer that T.M.'s future conduct would comport with her prior conduct. *In re D.S.,* 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.); *Jordan v. Dossey,* 325

46

S.W.3d 700, 732 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied).

As to T.M.'s parenting abilities, the evidence showed that although T.M. completed parenting class, she did not apply what she had learned and continued to associate with individuals who were dangerous and who committed violent acts. T.M. also continued to engage in violent acts after completing parenting class and anger management class. Furthermore, as stated above, T.M. failed to recognize that her behavior led to the removal of the children and continued denying that her actions were in any way detrimental to the children's well-being. The jury also heard evidence that although T.M. accused R.G. of sexually assaulting her, she was asking the trial court to grant custody of the children to R.G. The jury heard evidence that T.M. continued her relationship with H.M. and planned to stay with him even after he threw C.M. out of the vehicle. From this evidence, the jury may have reasonably concluded that T.M.'s parenting abilities were inadequate despite her completion of parenting classes.

Evidence was presented that T.M. availed herself of many of the programs that are offered by the Department. However, there was also evidence presented that those programs appeared to be having minimal impact on T.M.'s ability to act in the best interests of the children. The jury may have reasonably inferred based on T.M.'s past behavior that she would eventually allow H.M. to have contact with the children or even reunite with H.M. when he is released from prison. This, further supports the jury's finding that it is in the children's best interest to terminate T.M.'s parental rights.

The Department's plan for the children is to seek adoption for the children once T.M.'s and H.M.'s parental rights are terminated. K.H. testified that she and her

47

husband were willing to adopt the children. The evidence established that K.H. and the children have bonded and that they are thriving in their new home.

After reviewing all of the evidence, we conclude that the evidence was both legally and factually sufficient to support the jury's finding that termination of T.M.'s parental rights was in the best interest of the children. We overrule T.M.'s fourth issue.

## V. CONCLUSION

We affirm the trial court's judgment.


_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
9th day of May, 2013.

48